**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**AT BOWLING GREEN**

| | |
|---|---|
| **KAREN MORGAN**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**KENTUCKY INDUSTRIAL HOLDINGS, INC., RUSSELLVILLE ENGINEERED CASTINGS, INC., and NEXTEER AUTOMOTIVE CORPORATION,**<br><br>Defendants. | Case No. 1:26-cv-00013-GNS<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Karen Morgan ("Plaintiff"), individually and on behalf of all others similarly situated, brings this First Amended Class Action Complaint against Defendants Kentucky Industrial Holdings, Inc. ("KIH"), Russellville Engineered Castings, Inc. ("REC"), and Nexteer Automotive Corporation ("Nexteer") (collectively, "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

1. This is a class action under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 *et seq.* (the "WARN Act"). On or about August 22, 2025, Defendants shut down the Russellville Engineered Castings plant in Russellville, Kentucky and fired its workforce. The WARN Act required sixty days' written notice. Defendants gave days.

2. The closing surprised the workers. It did not surprise Defendants. For well over a year, the plant's owner told Nexteer Automotive Corporation ("Nexteer")—the plant's dominant customer and, by May 2025, its senior secured lender—that Russellville had two paths: a real

commitment to keep it running, or a controlled wind-down with proper WARN notices so that no one would be caught off guard. Nexteer refused both. When the plant's owner concluded in early 2025 that WARN notices should go out, Nexteer's treasurer asked him to hold off. He did.

3. Nexteer then took the plant's controls. It put its own people on the shop floor every week. It hired and paid the consultant who managed the plant's weekly budget, and it decided, week by week, which bills—including payroll—would be funded. It set staffing levels, approved overtime, directed the plant to recruit workers for a third shift, and made tooling decisions that belonged to the supplier. It bought the plant's defaulted secured loan and never sought a dime of repayment. And all the while, it quietly lined up a replacement supplier and planned its exit.

4. When the replacement was ready, Nexteer pulled the plug. On August 19, 2025, it canceled every purchase order and cut off the aluminum the plant needed to run. Within days, the workforce was gone. Nexteer then refused to fund an orderly wind-down, refused to pay the roughly $800,000 it owed the plant—money the plant needed to pay its workers—and foreclosed on the plant's equipment.

5. Plaintiff brings this action on behalf of herself and the other similarly situated former employees who worked at the Russellville plant and were terminated as part of the plant closing and/or mass layoff ordered by Defendants on or about August 22, 2025, and within 90 days of that date, without the sixty days' advance written notice the WARN Act requires.

6. The WARN Act exists for exactly this moment. Many of these employees spent their careers at this plant. Sixty days' notice would have given them time to find other work, to seek retraining, and to plan. Defendants took that time from them, and the Russellville community will bear the cost.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5).

8. This Court has personal jurisdiction over each Defendant. KIH and REC are organized under the laws of, registered to do business in, and/or headquartered in Kentucky, and operated the Russellville plant. Nexteer purposefully availed itself of Kentucky: for years it contracted with and purchased parts from the Russellville plant; it sent its employees to the plant on a weekly basis to direct production, staffing, and tooling decisions; it acquired a loan secured by machinery, equipment, inventory, and receivables located in Kentucky; and it foreclosed on and arranged the sale of that Kentucky collateral. Plaintiff's claims arise from that Kentucky conduct.

9. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 29 U.S.C. § 2104(a)(5), because the WARN Act violations alleged here occurred in this District and Defendants transact business in this District.

## PARTIES

10. At all relevant times, Plaintiff was a member of the Class (as defined below).

11. Plaintiff Karen Morgan is a citizen of the United States and a resident of Russellville, Kentucky. She was employed by Defendants at the Russellville Facility at all relevant times. She was employed for more than six months and is an "aggrieved employee" within the meaning of 29 U.S.C. § 2104(a)(7). She was terminated without cause on or about August 22, 2025, and did not receive sixty days' advance written notice of her termination.

12. Defendant Russellville Engineered Castings, Inc. ("REC") is incorporated in Delaware and registered to do business in Kentucky, with its principal place of business at 232

Hopkinsville Road, Russellville, Kentucky 42276 (the "Russellville Facility"). REC may be served through its registered agent, CT Corporation System.

13. Defendant Kentucky Industrial Holdings, Inc. ("KIH") was incorporated in Kentucky until October 2, 2025, when it was administratively dissolved. Its principal office was located at 232 Hopkinsville Road, Russellville, Kentucky 42276. KIH may be served through its registered agent, Todd DiBenedetto, at 232 Hopkinsville Road, Russellville, Kentucky 42276.

14. Defendant Nexteer Automotive Corporation ("Nexteer") is, upon information and belief, a Delaware corporation with its headquarters in Auburn Hills, Michigan and substantial operations in Saginaw, Michigan. Nexteer is a global manufacturer of automotive steering and driveline systems and is, upon information and belief, ultimately owned by a foreign parent company. Nexteer may be served through its registered agent, CT Corporation System, 40600 Ann Arbor Rd E, Ste 201, Plymouth, Michigan 48170.

15. As used in this Complaint, "Nexteer" includes Nexteer Automotive Corporation and the affiliates, divisions, and special-purpose entities through which it acted with respect to REC, including the entity through which Nexteer acquired REC's secured debt and the Nexteer affiliate in Mexico that co-signed the termination of REC's purchase orders. Plaintiff will seek leave to name any such entity separately as discovery identifies it.

16. At all relevant times, REC employed over 100 employees at the Russellville Facility, and Nexteer employed many thousands. Each Defendant, individually and as part of a single employer, is a "business enterprise" that employed 100 or more employees, excluding part-time employees, within the meaning of 29 U.S.C. § 2101(a)(1).

## FACTS

**A. The Russellville Facility**

17. The Russellville Facility is an aluminum die-casting and machining plant. It has operated since 1956, when it began as a captive die caster for Rockwell Corporation.

18. Before September 2023, the plant was owned by RANE, an Indian multinational manufacturer. Under RANE, the plant lost money year after year.

19. The plant's hourly production and maintenance employees were represented by the UAW under a collective bargaining agreement with REC. Roughly a third of the workforce was not represented.

**B. KIH and REC Operate as a Single Employer**

20. In the fall of 2023, Todd DiBenedetto formed KIH for one purpose: to acquire REC. On or about September 14–15, 2023, KIH acquired 100 percent of REC's stock.

21. DiBenedetto is KIH's sole owner. KIH had no employees of its own. Its only business was owning REC.

22. KIH financed the acquisition with a term loan of approximately $2 million from GemCap Solutions, later held by AB Lending SPV, LLC (together, "GemCap"), secured by REC's machinery, equipment, inventory, and accounts receivable.

23. Upon the acquisition, DiBenedetto became REC's President and installed his business partner, Mark Heinze, as REC's Chief Operating Officer. Both live in the Chicago suburbs. DiBenedetto oversaw REC's corporate and financial affairs and its relationships with key customers; Heinze oversaw its operations.

24. DiBenedetto and Heinze personally negotiated with the union over contract renewals and, in the plant's final months, over the plant's future.

25. DiBenedetto, on behalf of KIH and REC, issued the WARN notice announcing the plant's closing.

26. KIH and REC share common ownership, common officers, and a common decision-maker. KIH, through DiBenedetto, exercised de facto control over REC, including over the decision to close the Russellville Facility and the decision about when, and whether, to give WARN notice. REC's personnel policies emanated from the same source, and KIH's only operations and only source of value were REC's. KIH and REC are therefore a single employer under 20 C.F.R. § 639.3(a)(2).

**C. Nexteer: REC's Dominant Customer**

27. Nexteer had been REC's key customer for years before KIH acquired it. When KIH bought the plant, Nexteer accounted for roughly half of REC's approximately $20 million in annual revenue. As other customers left, Nexteer's share grew to a much higher percentage.

28. REC cast and machined aluminum steering housings for Nexteer, which Nexteer incorporated into vehicles including the Jeep Cherokee and the Ford F-150. REC shipped parts to Nexteer facilities in Michigan and Mexico.

29. REC was Nexteer's single-source supplier for these parts. The tooling to make them—tooling Nexteer owned—existed only in Russellville. Moving the work elsewhere would take Nexteer many months and significant investment.

30. Everyone involved understood that the plant would live or die by Nexteer's decision whether to support it.

31. Within weeks of the acquisition, in the fall of 2023, DiBenedetto and Heinze flew to Saginaw to meet with Nexteer's senior purchasing leadership and tell them the plant was not sustainable under the existing pricing.

32. Nexteer's involvement grew in stages. First, Nexteer began paying REC weekly instead of on its contractual net-60 terms. Next, under a material supply agreement, Nexteer bought the aluminum REC needed and shipped it to the plant. Nexteer pre-funded tooling deposits, funded repairs, and paid for overtime through purchase orders and invoices issued at its direction.

33. None of this was required by Nexteer's supply contract. Under that contract, decisions about overtime, staffing, and production were REC's alone. By 2025, Nexteer was making them.

**D. Nexteer Controls the Plant's Money**

34. Beginning by approximately October 2024, Nexteer retained, and paid, an outside financial consultant, Nancy Colah, then of B. Riley, to work side by side with REC managing its cash. Nexteer brought her back in early 2025 as REC's lender turned up the pressure.

35. Ms. Colah worked through REC's weekly budget—what would be paid, what would not, who would be paid, and who would not. She then took REC's needs to Nexteer's Treasurer, Troy Southwell, and Nexteer decided whether to fund them.

36. REC had no other source of capital. Each week, Nexteer decided whether REC could pay its vendors, its utilities, and its employees. When a utility threatened to cut service, REC put the utility in direct contact with Nexteer.

37. That included payroll. Each week, REC submitted its payroll need through Ms. Colah. If Nexteer chose to fund it, the workers were paid; if Nexteer did not, they could not be.

38. Nexteer, in short, controlled REC's ability to operate.

**E. Nexteer Tells REC to Hold Off on WARN Notice**

39. From at least October 2024 forward, REC repeatedly urged Nexteer to choose: commit to the plant's future, or agree to a controlled wind-down—with timely WARN notices, an orderly transition, and no surprise shutdown on a few days' notice.

40. By February 2025, REC was raising with Nexteer the timing of WARN notices, how notice would be communicated to employees, and the impact of notice on key employees.

41. Nexteer refused to engage. Every time a wind-down was raised, Nexteer avoided it.

42. By late February 2025, GemCap was threatening to foreclose on its collateral—the plant's machinery and equipment. A foreclosure would have forced a shutdown, and REC concluded that it was appropriate to issue WARN notices.

43. Nexteer stopped it. In or around late February or early March 2025, Nexteer's Treasurer asked REC to delay any formal steps toward a shutdown, including WARN notification. REC agreed to Nexteer's request.

44. REC complied with Nexteer's request. No WARN notice issued. Had it issued then, the Russellville workers would have had months of notice instead of days.

**F. Nexteer Takes Operational Control of the Plant**

45. In or around March 2025, Nexteer assigned one of its own employees, a quality representative, to the Russellville account. That employee and his supervisor, Dawn Bitzer, took turns at the plant every week, typically for two or three days at a time.

46. Nexteer's on-site personnel were on the production floor every day they were there, working directly with REC's quality, engineering, maintenance, and manufacturing employees. They were in the front row of manufacturing decisions—which parts would run that day, when and

how to change over tooling, whether to air-freight a replacement tool or switch the machine to another job, and whether a flawed part could ship.

47. Nexteer's personnel also decided for themselves, week to week, whether they needed to be on site to oversee a particular event—like a new tool going into a press—or could direct the plant remotely.

48. Nexteer convened and chaired standing meetings every Monday, Wednesday, and Friday to review production at the plant. Those meetings addressed staffing, including planning for new hires and training.

49. Nexteer set the plant's staffing. Because Nexteer funded the cost, Nexteer decided whether employees would work overtime on Saturdays and Sundays, how many workers would staff a line, how many inspectors a line would have, whether to add workers to the second shift, and whether to elevate employees into higher-paid positions under the collective bargaining agreement. REC's human-resources staff then filled the headcount Nexteer approved.

50. Nexteer also directed REC to grow its workforce. In the spring of 2025, Nexteer's on-site personnel directed REC to recruit additional employees and implement a third shift. REC complied and stood up a third-shift crew.

51. Nexteer controlled what the plant shipped, and when. It decided which purchased aluminum would be used for which parts, prioritized its own Saginaw parts over parts for its Mexico affiliate, and controlled the return of the specialized shipping containers without which REC could not ship at all.

52. Nexteer took over the plant's tooling decisions, too. In the summer of 2025, Nexteer informed REC that it had designed replacement tooling itself and selected its own toolmaker—

functions that ordinarily belong to the supplier, not the customer. REC personnel were excluded from those decisions.

53. Nexteer even negotiated, directly with RANE and without REC, the terms on which six engineering, quality, and finance specialists critical to the plant's operations would continue working there—and then funded the resulting $75,000 payment.

54. By May 2025, Nexteer had assumed an increasingly controlling role over the plant's operations, including tooling purchases and staffing decisions. REC raised that shift with Nexteer's senior purchasing executives.

55. Nexteer did not retreat. It instead instituted weekly meetings to ensure that all parties were aligned with, and agreed to, the operational decisions in front of them.

**G. Nexteer Becomes the Plant's Secured Lender—and Runs the Business Instead of Collecting the Debt**

56. By May 2, 2025, Nexteer, through an affiliated entity, purchased REC's defaulted secured loan from GemCap. Nexteer gave REC written notice of the purchase. From that point forward, Nexteer was both REC's dominant customer and its senior secured lender.

57. It is highly unusual for a customer to buy out its supplier's secured lender.

58. Nexteer did not buy the loan to collect it. It extended no new credit and no revolving line. It exercised no default remedies. And REC never made a single loan payment to Nexteer.

59. Instead, Nexteer used the position to keep the plant producing Nexteer's parts. Every day the machines ran, Nexteer's collateral lost value; every day the machines ran, Nexteer's parts shipped. Nexteer chose its parts.

60. From May through August 2025, Nexteer funded REC's entire cash flow, week by week, through payments it chose to make on REC's receivables—for overtime, for staffing, and for whatever other bills Nexteer agreed to cover.

61. After Nexteer bought the loan, its involvement in the plant's day-to-day operations only increased.

**H. Nexteer Plans Its Exit While Keeping the Workforce Working**

62. While Nexteer was directing the plant to add workers and a third shift, it was secretly building a replacement. Nexteer told REC there was no other vendor. In fact, Nexteer was standing up an alternate supplier—work that, in this industry, takes at least four to six months.

63. By no later than May 2025, Nexteer had internally identified alternate suppliers in China and Mexico, weighed the financial risk of moving the work versus staying with REC, and begun planning its exit from REC—including the timing of that exit based on the parts it had shipped and on hand.

64. Nexteer never shared those plans with REC—or with the workers whose jobs they would end.

65. Upon information and belief, Nexteer pushed REC to add a third shift in order to build a bank of parts that would carry Nexteer through its transition to the replacement supplier.

66. Meanwhile, Nexteer's Mexico affiliate, which had discussed investing in the plant in the spring of 2025, abruptly walked away in April or May 2025. REC's effort to refinance with another lender had already failed earlier that year. By June 23, 2025—sixty days before the closing—no one was pursuing any capital or business that could have saved the plant.

67. REC repeatedly asked Nexteer for a high-level meeting—including with Nexteer's North American president—to decide the plant's future. Nexteer never held it. Nexteer canceled

meetings, avoided the question, and kept the plant on a day-to-day footing through mid-August 2025.

**I. Nexteer Pulls the Plug, and Defendants Close the Plant Without Notice**

68. On August 19, 2025, Nexteer—through its Saginaw purchasing group and its Mexico affiliate—terminated all of its purchase orders with REC, asserting that REC had breached its supply obligations and stating that Nexteer was resorting to an alternate supplier.

69. REC had no warning. Before August 19, 2025, Nexteer had never told REC that it intended to terminate the purchase orders.

70. At the same time, a Nexteer purchasing executive told REC that Nexteer would deliver no more aluminum. Without metal, the plant could not cast parts.

71. Nexteer's termination of the purchase orders was the catalyst for the closing. Only then did KIH and REC issue WARN notice to the Commonwealth and to employees—notice that the terminations would take effect on August 22, 2025.

72. On or about August 22, 2025, Defendants terminated approximately 102 employees at the Russellville Facility, including Plaintiff—over 50 employees and at least 33 percent of the facility's workforce. A small crew stayed briefly to finish work in process, paid only as Nexteer agreed to fund it.

73. Plaintiff received notice of her termination only days before it took effect.

74. An orderly wind-down of a plant this size takes 90 to 120 days and depends on continued funding. Nexteer refused to fund one. It refused to participate in any discussion of the effects of the closing on the workforce.

75. Nexteer also refused to pay approximately $800,000 it owed REC on open receivables—the money REC needed to meet its obligations to its union and nonunion employees. REC repeatedly asked Nexteer to pay. Nexteer never did.

76. As a result, the employees were paid nothing for the sixty-day notice period and nothing for their accrued vacation. Nexteer's refusal to fund those payments is the only reason the employees were not paid.

77. Nexteer then acted as owner of what remained. As secured lender, it directed REC to assemble the plant's machinery and equipment for Nexteer, upon information and belief, retained former REC employees—including the plant manager—to work for it at the facility, and hired an auction company to sell the equipment.

**J. No Exception Excuses Defendants' Failure to Give Notice**

78. The closing was not caused by business circumstances that were not reasonably foreseeable. For two years, the plant's survival turned on Nexteer's support. REC knew it was in default of its supply obligations and that Nexteer could terminate the purchase orders whenever it chose. REC itself concluded in February 2025 that WARN notices were warranted. And Nexteer was planning its exit from REC no later than May 2025. The closing was neither sudden nor unexpected—and the decision that triggered it was Nexteer's own.

79. The faltering-company exception does not apply. As of June 23, 2025, no Defendant was actively seeking capital or business that had a realistic opportunity to avoid or postpone the shutdown, and no Defendant reasonably and in good faith believed that giving notice would have precluded obtaining it. The delay in notice was requested by Nexteer—the very party that would end the plant—not by any prospective source of capital or business.

80. Defendants also failed to give as much notice as was practicable or to provide a statement of the basis for reducing the notification period that satisfies 29 U.S.C. § 2102(b)(3) and 20 C.F.R. § 639.7.

81. Defendants knew of their WARN Act obligations. They discussed WARN notice timing with one another months before the closing and then chose to delay. Upon information and belief, Nexteer wanted the workforce to keep producing its parts until its replacement supplier was ready, and timely notice would have sent workers looking for other jobs. That is precisely the choice the WARN Act takes away from employers.

**K. Nexteer Was Plaintiff's Employer Under the WARN Act**

82. Nexteer is liable as an "employer" under the WARN Act because it exercised control over REC's business far beyond what was necessary to protect its interests as a customer or creditor, and it operated the Russellville Facility as an ongoing business enterprise for its own benefit.

83. Nexteer exercised de facto control over REC. It controlled REC's cash and decided which obligations, including payroll, would be paid. It placed its personnel on the plant floor weekly to direct production. It set staffing levels, approved overtime, and directed the recruitment of additional employees and a third shift. It made tooling decisions that belonged to REC. It negotiated directly with third parties over the terms on which key personnel would continue working at the plant. It bought REC's secured debt and declined to collect it so that the plant would keep producing Nexteer's parts.

84. Nexteer was also the decision-maker responsible for the employment practices that give rise to this action. Nexteer decided to terminate the purchase orders and cut off the plant's raw materials, which ended the plant. Nexteer decided not to fund an orderly wind-down, the notice period, or the employees' accrued benefits.

85. REC's operations were wholly dependent on Nexteer, which supplied its raw materials, funded its payroll, held its tooling, held its secured debt, and purchased most of its output. Nexteer's staffing decisions—headcount, overtime, shifts, and promotions—governed REC's workforce.

86. Nexteer and REC (with KIH) therefore constitute a single employer under 20 C.F.R. § 639.3(a)(2), and Nexteer is independently an employer under the WARN Act because it assumed responsibility for the management of REC's business and ordered the plant closing.

**CLASS ACTION ALLEGATIONS**

87. Plaintiff brings her WARN Act claim as a class action under Federal Rule of Civil Procedure 23 on behalf of the following class (the "Class"):

> All persons employed by Defendants at the Russellville Facility who suffered an employment loss, other than a discharge for cause, as part of or as the reasonably foreseeable consequence of the plant closing and/or mass layoff ordered by Defendants on or about August 22, 2025, or within 90 days of that date, and who did not receive 60 days' advance written notice.

88. Class treatment of this WARN Act claim is appropriate because each of Rule 23's requirements is satisfied:

a. The Class includes, upon information and belief, approximately 100 or more members, so joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

b. Questions of law and fact are common to the Class, including, *inter alia*: whether Defendants ordered a plant closing or mass layoff; whether Defendants gave the notice required by 29 U.S.C. § 2102; whether KIH, REC, and Nexteer are a single employer; whether Nexteer is an employer under the WARN Act; whether any statutory exception applies; and whether Defendants acted in good faith. Fed. R. Civ. P. 23(a)(2).

c. Plaintiff is a member of the Class, and her claims are typical of the claims of the Class. She has no interests antagonistic to or in conflict with those of other Class members. Fed. R. Civ. P. 23(a)(3).

d. Plaintiff will fairly and adequately represent the Class and has retained counsel experienced in WARN Act and class action litigation. Fed. R. Civ. P. 23(a)(4).

89. Certification is appropriate under Rule 23(b)(1) because prosecuting separate actions would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, and adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of others.

90. Certification is appropriate under Rule 23(b)(2) because Defendants acted or refused to act on grounds that apply generally to the Class, so that declaratory relief is appropriate with respect to the Class as a whole.

91. Certification is appropriate under Rule 23(b)(3) because common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Class members' damages are readily calculable from Defendants' payroll records.

## COUNT I
## VIOLATION OF THE WARN ACT, 29 U.S.C. §§ 2101 *et seq.*
## (Against All Defendants, on Behalf of Plaintiff and the Class)

Plaintiff re-alleges and incorporates all preceding paragraphs as if set forth fully here.

92. Each Defendant is an "employer" within the meaning of 29 U.S.C. § 2101(a)(1) and 20 C.F.R. § 639.3(a). KIH and REC constitute a single employer. Nexteer, KIH, and REC together constitute a single employer, and Nexteer is independently an employer because it exercised de facto control over REC and ordered the plant closing.

93. On or about August 22, 2025, Defendants ordered a "plant closing" and/or "mass layoff" at the Russellville Facility within the meaning of 29 U.S.C. § 2101(a)(2)–(3).

94. The Russellville Facility is a single site of employment. It was the home base of Plaintiff and the Class, the place from which their work was assigned, and the place to which they reported.

95. The closing and/or layoff resulted in "employment losses," as defined in 29 U.S.C. § 2101(a)(6), for at least 50 employees, excluding part-time employees, during a 30-day period, and for at least 33 percent of the employees at the Russellville Facility. Any employment losses within any 90-day period are aggregated under 29 U.S.C. § 2102(d).

96. Plaintiff and the Class are "affected employees" within the meaning of 29 U.S.C. § 2101(a)(5).

97. The WARN Act required Defendants to serve written notice at least 60 days before ordering the closing or layoff on each representative of the affected employees or, if there was no such representative, on each affected employee, 29 U.S.C. § 2102(a)(1), and on the State dislocated worker unit and the chief elected official of the local government within which the closing or layoff occurred, 29 U.S.C. § 2102(a)(2).

98. Defendants did not give the required 60 days' written notice to Plaintiff, to the Class, or to their representative. Upon information and belief, Defendants also did not give timely notice to the chief elected official of the local government within which the closing or layoff occurred.

99. No exception to the notice requirement applies.

100. Defendants violated 29 U.S.C. § 2102 by ordering the closing and/or layoff without the required notice.

101. Plaintiff and the Class are "aggrieved employees" within the meaning of 29 U.S.C. § 2104(a)(7), and the WARN Act authorizes them to sue on their own behalf and on behalf of others similarly situated. 29 U.S.C. § 2104(a)(5).

102. Defendants are jointly and severally liable to Plaintiff and each Class member for back pay for each day of the violation, up to 60 days, and for the value of benefits under any employee benefit plan, including medical expenses incurred that would have been covered, for the violation period. 29 U.S.C. § 2104(a)(1).

103. Defendants did not act in good faith and had no reasonable grounds to believe their conduct complied with the WARN Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court:

1. Certify the Class under Federal Rule of Civil Procedure 23, appoint Plaintiff as Class Representative, and appoint her counsel as Class Counsel;
2. Declare that Defendants violated the WARN Act;
3. Enter judgment against Defendants, jointly and severally, for back pay to the fullest extent permitted by 29 U.S.C. § 2104(a)(1)(A);
4. Enter judgment against Defendants, jointly and severally, for the value of lost benefits, including medical expenses incurred during the period of the violation, to the fullest extent permitted by 29 U.S.C. § 2104(a)(1)(B);
5. Find that Defendants' violations were not in good faith and that Defendants had no reasonable grounds for believing that their conduct complied with the WARN Act, 29 U.S.C. § 2104(a)(4);

6. Award civil penalties to the fullest extent permitted by 29 U.S.C. § 2104(a)(3);

7. Award reasonable attorneys' fees, litigation costs, and expenses under 29 U.S.C. § 2104(a)(6), and costs under Federal Rule of Civil Procedure 54(d);

8. Award pre- and post-judgment interest as allowed by law; and

9. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED: November 2, 2026

Respectfully submitted,

*/s/ Andrew E. Mize*

Andrew E. Mize (Ky. Bar No. 94453)
J. Gerard Stranch, IV*
Michael C. Iadevaia*
**STRANCH, JENNINGS, & GARVEY, PLLC**
223 Rosa Parks Ave. Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
amize@stranchlaw.com
gstranch@stranchlaw.com
miadevaia@stranchlaw.com

**Admitted pro hac vice*

***Attorneys for Plaintiff and the Proposed Class***

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2026 a true and correct copy of the foregoing First Amended Class Action Complaint was filed with the Clerk via the Court's CM/ECF system, which will serve all counsel of record and a copy has also been served via U.S. Mail to the following Defendant:

Nexteer Automotive Corporation
c/o CT Corporation System
40600 Ann Arbor Rd E, Ste 201
Plymouth, Michigan 48170

*/s/ Andrew E. Mize*
Andrew E. Mize (Ky. Bar No. 94453)